May it please the Court, Henry Weissman for the appellant. I'd like to reserve three minutes for rebuttal. Excessive and discriminatory right-of-way fees are preempted. If a city said the incumbent pays nothing, the entrant pays 25, 50, 100 percent of its revenue in order to use the right-of-way, there's no question that that would be preempted. That's the whole point of Section 253C, which allows only those right-of-way fees that are reasonable and non-discriminatory. And because Congress meant to preempt excessive and discriminatory right-of-way fees, it clearly did not regard such fees as being taxes under Section 601. Now, if a city could circumvent preemption simply by taking these funds collected through these right-of-way fees that are excessive and discriminatory and depositing them into general fund, then as a practical matter, a city can block competitive entry as they see fit, which is contrary to the manifest purpose of the 96 Act. Now, apart from the 96 Act, right-of-way fees are not taxes under the Tax Injunction Act. They are user fees. It's a voluntary transaction in exchange for a government-provided benefit. And this Court, in Hexham and most recently in the Arizona Life case, indicated that user fees are not properly regarded as taxes under the Tax Injunction Act. And when the Tax Injunction Act was passed, it was crystal clear that user fees in general and fees for the privilege of using the right-of-way in particular were not regarded as taxes. So to try to answer your question, Judge Rawlinson, the best case on the point that the fee for the privilege of using the right-of-way is not a tax is the U.S. Supreme Court's decision in the St. Louis case, which we discussed in our brief, which specifically reached that holding, along with many other Supreme Court cases, which we What's the full name of the case? There are several cities. Sorry. City of St. Louis versus Western Telegraph. That's correct, Your Honor. There are several citations on the case. I would cite on page 32 of our opening hearing. Is it the 148 citation or the 149 citation? Either one. It's both the same case. Okay. It's the case and then the case on rehearing. All right. Now... But just, Mr. Weston, just to so I understand, make sure I'm in complete sync with you. There were two fees here, right? In this case, there are, yes. Yes. There was a 2% registration fee. Yes. And then a 7% license fee for use of the right-of-way. Correct. So your remarks said we're just at the use of the right-of-way. Is that correct? That's correct. Neither exaction is properly regarded as a tax. The 7% fee, which is the focus of my remarks so far, because it's a voluntary transaction, because it was meant to be preempted. The 2% fee, that is in the category of compulsory exactions, and so in that case it's necessary to distinguish between those compulsory exactions that are properly regarded as regulatory fees, which this clearly is, versus those that are properly regarded as taxes, which it isn't. Now, sometimes the court applies BIDART to distinguish between those two categories, and the registration fee, the 2% fee, clearly would not be regarded as a tax under the BIDART factors. Counsel, are there any cases that have applied these City of St. Louis cases in the over 100 years since they were... Yes. Yes, Your Honor. In the tax injunction context. Well, we cite those cases because they set forth the background understanding of what a tax meant at the time the Tax Injunction Act was passed. More recent cases, which we cite in our brief... What's the strongest, most recent case you have regarding application of the Tax Injunction Act to franchise fees? There are two. The Second Circuit's decision in National Railroad Passenger Corporation, cited at page 35 of our opening brief, and the Fifth Circuit's decision in City of Dallas, cited at page 36 of our opening brief. If I might, Your Honor... Just let me back you up a little bit. So, or maybe you're going to address it head on, but why doesn't City of Surprise... Thank you, Your Honor. I was just about to turn to that. You know, we're bound to apply circuit law. Of course, Your Honor. We have to look at... City of Surprise is our circuit opinion that really seems to govern this. That case is inapplicable here for four reasons. Number one, the specific holding of that case was limited to fees which were deposited into the general fund. That's the language of the holding of the case. In this case, it's undisputed that the 2% fee is not deposited into the general fund. And the 7% right-of-way fee, at this stage of the proceeding, it must be accepted as true, our allegation in the complaint, that the 7% fee is also segregated from the general fund. We allege that in the complaint. This was dismissed on 12B1 without an evidentiary hearing, and under this circuit... Go ahead. And that is what the findings in support of the ordinance say. So that's the narrow... There are some... I forget exactly if it's in the ordinance or if it's just in the briefs or in the record or someplace, that it was segregated because there was some sort of tax-wide, statewide tax initiative on property... Yes. ...that said that they couldn't... The cities couldn't replace those property taxes with other fees. That's correct. And so in order to make it clear that they weren't doing that... Yes. ...they just put them in a separate account, but that it was intended to be used for the benefit of the city. That's not... It is segregated. So that's point number one. Am I missing something there? In terms of the narrow holding of City of Surprise, it's distinguishable because these fees are segregated. That case spoke of depositing into the general fund. In terms of the purpose or use of the funds, the findings in support of the ordinance say that the 2% fee is used basically to defray the costs of the regulatory program and that the 7% fee is used to defray the costs of deterioration of the streets, increase complexity... That sounds like it's for the general benefit of the citizens of Eugene. Not at all, Your Honor. Well, first, we're now talking about... We're now on to the second point. So my first narrow point was that the specific language of Surprise is distinguishable because these fees are not deposited in the general fund. Well, let's say it's directed. Directed to the municipality's general fund. It didn't say deposited in the general fund. It said directed to the... That's correct. Yes. And this is not directed to the general fund. It is directed to a segregated account. Point two of distinction. It sure sounds, at least with respect to the 7%, it sure sounds like it's intended for the benefit of the citizens of Eugene. It's not, and that's the second point. So the second point is, in Surprise, Quest conceded that it lost under Bidart. It didn't contest the application of Bidart. That's what the Court said in its opinion. In this case, under Bidart, these exactions should not be regarded as taxes. So with respect to both of these fees, they are enacted by an ordinance that states that its purpose is to, quote, regulate telecommunications activities in the city. Moreover, there's no statement of intent to raise revenue, and this ordinance has all the hallmarks of a traditional regulatory regime. There's qualifications requirements. There are inspection requirements. There are approval for transfer requirements. This is a regulatory program. The 2% fee is called a registration fee, and its findings say, this is ER 295, that it's a reasonable charge for the city's investment in developing and implementing telecommunications policies and programs. When a fee is designed to defray the costs of regulation, that is considered not to be a tax under a long series of cases, and I would cite, for example, the head money cases where the money was spent to care for immigrants, the San Juan cellular case, a 3% of gross revenue fee on a telecom carrier to defray the costs of regulation, and this Court's opinion in Wright v. Riveland where 35% of outside income of inmates was held back  Those were all held not to be taxes because it was primarily directed at supporting a regulatory regime, even though there was an incidental public benefit, and the fact that this ordinance is designed to promote public health, safety, and welfare generally is not sufficient to characterize it as a tax. That's true of any ordinance, and this Court said in Bidart that kind of general language is not sufficient. Now, the 7% fee, likewise, is ancillary to the regulation of the right-of-way, and the findings in support of the ordinance, again, say this is reasonable compensation for the deterioration of the streets, increased costs for public work projects, and so on. Those are the kinds of things that have traditionally been associated with regulatory programs. The segregation of the fees away from the general fund is not necessary, but it is an added reason under Bidart. Reason number three. These ordinances operate in a fundamentally different manner than those that were considered in Surprise. This is a very important distinction. First of all, the Court did not establish a categorical rule in Surprise that said any right-of-way fee is automatically a tax. Our opponent agrees that the Court did not so hold, and the Court signaled its intent to limit its holding by its ruling in Berkeley, where it didn't raise the Tax Injunction Act sui sponte, even though there was a non-cost-based right-of-way fee, and by saying that the cases that Quest had cited, which included Hawthorne and Berkeley, did not have fees that were similar to those that were at issue. Otherwise, Your Honor, if the Court's holding in Surprise means that any right-of-way fee is automatically exempt, then you're destroying the Telecommunications Act, because as I said at the outset, that would give cities carte blanche to deduct any kind of a right-of-way fee they want, no matter how discriminatory or onerous, and call it a tax right of way. But you could go to state court. No, we can't. Well, throw it over to state court. We can't, because 601. I just got told that there was a remedy. There's a remedy in state court to raise all this. Because 601 of the Telecom Act says that if it's a tax, it's not preemptive. So if the Court were to conclude that any right-of-way fee is a tax, then what you're saying is the Telecom Act doesn't preempt it. And that's plainly contrary to the manifest purpose of the Act, which was to remove local authority to impose barriers to entry. So it's not a matter of just relegating us to state court. It's a matter of saying there is no preemption under the Telecom Act, which would really eviscerate the Act. Now, the point I wanted to make about the ordinances in Surprise, I see my time is running down. But that would only apply to the franchise fee portion, not to the other requirements of the Act. Yes, but if the city can impose a franchise fee of 100 percent and say we're going to deposit that money into the general fund and completely block entry, then the whole point of Section 2. No, because the state court could also decide whether or not it's violative of the. It could not. Because Section 601 says, Section 601 of the Telecom Act says that it is not meant to preempt any state or local tax. So if a right-of-way fee is regarded as a tax, then it's not preemptive. But we heard from counsel in another case that one of these cases had gone all the way up through the state court. A bargain, how could that happen if it's not subject to review in state court? It was not a Federal telecom claim. And the Arizona case, which I think the Court may be referring to, Your Honor, may be referring to, is actually. Well, I thought the representation was that it was under the TCA, that it was under the Telecommunications Act, and it went all the way. I thought he said the state of Oregon, that it went all the way through the state to the state supreme court with these specific claims addressed. The issue in this case, Your Honor, and this is the court that needs to decide the question, whether excessive and discriminatory right-of-way fees are preemptive. If they're preemptive. I understand that we need to decide the question, but I'm questioning your representation that there would not be an ability to challenge the franchise fees if we decided that the Tax Injunction Act applied. Because the reason that I'm saying that, Your Honor, is because if the court were to say that these right-of-way fees are taxes, the consequence would be they would be exempt from preemption in state or Federal court pursuant to Section 601. I'm not sure that follows, but I understand. The court has said that the meaning of the term tax under Section 601 is the same as under the Tax Injunction Act. That's what the court said in surprise in the footnotes. So, therefore, if the court were to say right-of-way fees are taxes, then what the court is saying is they're not preemptive. Of course, it depends on the nature of the fee, doesn't it? Absolutely. And not all right-of-way fees may necessarily be taxes in quotation marks for the Injunction Act purpose. Precisely. But are you complaining about the current fees that are imposed on your client, suggesting that they're in some fashion onerous, prohibited, too much? Yes. 2 percent is too much? No, the 7 percent. We're complaining about both. But when we speak of the right-of-way fee, we're complaining of the 7 percent of those right-of-way fees. 7 percent is too much. We're saying 7 percent is too much for two reasons, Your Honor. Number one, it's discriminatory, because the incumbent pays a lower amount. So what? That puts us at a competitive disadvantage. And who is the incumbent? Quest. They pay less. They do. And that puts us at – so when we try to pass through our fees, as Judge Rawlinson said, if we have to pass through a higher fee than our competitor, we lose business. And when were they enfranchised? Forever. Well, okay. But they had a beginning point. Yes. And we had a beginning point, too. And the franchise fee that we paid originally was much, much lower. It was only later on that they increased it by a thousand percent that caused us to have concern. And I might say, Your Honor, although we're not here discussing whether or not we've stated a claim on the merits, because this is a jurisdictional inquiry, so the Court has to decide a jurisdictional question. Who gets to say? It's a who gets to say question. Whether the State court gets to say or whether we get to say. Well, if the Court were to decide that the Tax Injunction Act does not bar our challenge to these fees, the proper response would be to remand so that we can pursue our claim on the merits. Yes. I have one question in connection with that, and then you're over your time. I apologize. So the district court judge here, once she decided that the Tax Injunction Act barred the claims against these fees, she also said that there were some non-fee-related claims. The attack is on the entire ordinance. Yes. She said those non-fee-related claims are so intricately connected with the fee claims that as a matter of judicial economy, I'm dismissing. Yes. What do you want us to do with that? That was error, Your Honor. There is no basis for doing that. She invoked Colorado River abstention. That only applies if there's another action pending in State court, which there wasn't. I appreciate that I'm over my time, Your Honor. I think it's time for rebuttal. Give me 30 seconds to just wrap up. Let me finish up your remarks and then you can go. Thank you, Your Honor. I really appreciate it. I was saying that the ordinances apply in a different manner in Tucson and here. In Tucson, there was a state law that preempted localities from imposing a fee for the use of the public highway and permitted, however, transaction privilege taxes on the business of local telephone service. And the Arizona Court of Appeals said what these taxes, what these exactions are, really is not a fee for the use of the right-of-way but a tax on the business because they only fell on a subset of those people who were occupying the right-of-way. That was the key difference there. Here, these fees are imposed explicitly for the privilege of using the right-of-way. And finally, as we pointed out in our 28-J letter, this Court has recently said in the 7-Up Heat Venture case that a prior precedent cannot be considered to have resolved issues or arguments that were not directly addressed and did not receive reasons consideration. And I would say that this is a case in which the city of Surprise did not directly address or reasonably consider the point that allowing the city to determine whether its right-of-way fee is subject to preemption would eviscerate the preemption provisions of the Act.  Thank you. Good morning. I'm Sharon Rudnick representing the city of Eugene. And before I address the crux of this case, I do want to point out that these very fees that are at issue in this case were challenged in 2001 in state court under the Federal Telecommunications Act and were, in fact, upheld. That was a case called AT&T versus the city of Eugene. NCI talks about the purpose of the preemption provisions of Section 253 as prohibiting prohibitive barriers to entry. And that's correct as far as it goes. But Section 601 demonstrates that what the intent of the FTA really is, is to preempt barriers to entry unless they're taxes. Because if they're taxes, then federal jurisdiction is divested by the Tax Injunction Act. And that's really the issue that's before the court here. And because I have 15 minutes only, I want to cut to the crux of the issue, which is whether the district court was correct in determining that the two fees at issue here are taxes, and therefore any challenge to them should occur in state court and not in federal court. We've talked already about the BIDART test that's been adopted here and most of the circuits around the country, but that test is not a mechanical test. The Hexham case makes it clear that really what the court is looking at is what that court calls the gestalt of the fee, to determine whether the fee is a revenue-generating measure used to benefit the public good or whether it's more akin to an administrative fee that pays for the benefits or services that are provided to those who are paying the fee. And that's really the question here. MCI talks a lot about what it calls the regulatory nature of the program, and the city disputes that its program is regulatory. We don't believe we're regulating anyone. But even assuming for the sake of argument that it was part of a regulatory system or that the ordinance was regulatory, that really doesn't matter, because the question of jurisdiction turns ultimately on the ultimate use of the funds that are generated by these fees. According to the Hexham case and the BIDART case and the City of Surprise case, a tax is intended to generate revenue that's used to benefit the public good, to pay for things that are generally paid for by tax revenue, while a non-tax is generally used to recoup the cost of the service or benefits that are provided to those paying the fee. So the question is, is this a tax or a non-tax, as this court and the City of Hexham set it out? So turning to the two fee provisions, and they are separate provisions, the 2% fee, the registration fee, is based on gross revenue. It's not based on the cost of the registration or license program. It's not based on to recoup what it costs the city to review the application. It is simply a gross revenue fee. And the revenue goes into a segregated fund in the budget. You're correct, Your Honor, that the reason it's segregated, as we point out in our brief, is that now-defunct Measure 47 amended the Constitution to say that fees could not be used to replace property taxes. So these revenue, the registration fee, was segregated so that the city could demonstrate that it wasn't using fees to replace property taxes, which go into the general fund. But the record demonstrates that the 2% gross revenue fee is used very specifically to benefit the public. For example, the record shows that the fee is used in part to pay for the office of the city staff that administers all of the telecommunications and utility programs, but the majority of it has been used specifically for things like putting Internet service into homeless shelters so that people who are homeless can search for jobs, in putting computers in police cruisers to provide public safety, to upgrade and maintain the city's general website where the public can go to access forms and ordinances and information. These are clearly uses, specific uses, that benefit the general public. They don't benefit MCI or any other telecommunications provider. And at this point, I want to talk about the record for just a second because MCI says, well, you can't consider any of that evidence because you have to rely on our pleadings. But the city of Eugene filed a motion to dismiss and attached the evidence that I'm referring to now. Under the federal rules, that becomes a motion for summary judgment, and MCI is allowed to offer evidence in rebuttal or in return. MCI didn't do that. It didn't move to strike the affidavit. It didn't notice a deposition. It didn't ask for a request for production. It says in its briefs that it asked the court at oral argument, which it did, to allow him discovery, but MCI didn't need the district court's permission to conduct discovery at that phase of the case. It could have conducted whatever discovery it wanted before it responded to the motion. And so she — How did the district court treat it as a motion for summary judgment?  And she said that delaying her ruling after the matter was at issue in order to allow discovery to occur at that date wasn't reasonable. And so she certainly acted as if she treated it that way. With that issue aside, the 2 percent registration fee is clearly a revenue-raising matter based on gross revenue, not tied to the benefits provided to the telecommunications company, not tied to the cost to the city of administering the registration fee. And the revenue is clearly used for general purposes. Applying the bid art standards, same result. Although the first two prongs are not determinative, these fees were enacted by the city council in its legislative capacity by ordinance. They apply to all telecommunications providers, not just telephone communications like MCI, video, audio, data. And as I said, the ultimate use, which is really the key consideration, is for the public good. The same is true of the 7 percent fee. The 7 percent fee is assessed against companies who use the right-of-way in order to provide telecommunications services. It, too, is a percentage of gross revenue. It's not based on the impact of the use on the right-of-way. It's not a per foot or a per mile charge. It's not based on how many telephone poles or ditches that you dig in the right-of-way. It's not designed to recoup the cost that the city has and expends in processing the license. It is a gross revenue fee so that a provider that uses one mile of right-of-way but generates a tremendous amount of revenue doing business in the city will pay a much more significant fee in gross than somebody who uses 30 miles but doesn't generate the same level of revenue. It is clearly a revenue-based provision. It goes into the general fund. That is really undisputed. And the general fund is the same as any general fund in most cities. It's where property taxes go. It's where revenue goes that supports, that is not earmarked, that supports the general services of the city. And so there really can be no question that the ultimate purpose of both of these fees, both in the way they are assessed and the way they are used, is revenue generating to benefit the public. They are not used to pay for the services or the benefits provided to the telecommunications companies, which is the way fees are defined and implemented. Now, the fact that the 7% fee is assessed against companies using the right-of-way is equally irrelevant. The Ninth Circuit, this court in the city of Surprise said that. Said that the fact that some fees in other cases it cited were actually called rent for the right-of-way didn't mean that the fee couldn't be a tax. It's not the label. It's the nature and the use of the revenue that is generated that determines whether it's a tax or a fee. You think city of Surprise just controls the outcome here? I think city of Surprise makes any other outcome pretty untenable here. I mean, I think it is on point. I think that the court is obliged to look at every fee on its own merits. But I do think that the fees in city of Surprise are virtually identical to the fees charged here. The city of Surprise, cities in city of Surprise, charge the same two kinds of fees that are at issue here, a percentage of gross revenue on telecommunications providers who do business in those cities, and then for a couple of the cities, an additional percentage of gross revenue fee for those who use the right-of-way. That is exactly the circumstance that we have here. And the distinctions that MCI raised with the court are really not distinctions at all. I've already addressed the general fund issue. The key is, and the city, the Hexham case says this expressly, the issue isn't where the fees are booked. The issue is how they're used. And the fact that the 2 percent fee is booked in a segregated line item in the general budget doesn't make it not a tax for TIA purposes. So what's your response to opposing counsel's observation that the challengers in city of Surprise conceded the issue, and therefore, in this case, it has a different posture? Well, the court in that case applied the same standards. The analysis in the city of Surprise case applies the same standards that Biddart lays out. It went through the same exact analysis that the district court did in this case. And so if you look at the case and the analysis the court went through, the exactions that it applied the legal standards to, and the outcome that it reached, there really is no significant way to distinguish either the issues that it was addressing or the analysis that it applied. The other point that MCI raises is that somehow the city of the Arizona city's fees operate differently than these operate, because they were on the business as opposed to a right-of-way fee. And that, Your Honor, I submit is really semantics. The charges were assessed against the telecommunications providers either because they did business in the city or they used the right-of-way. They were both gross. Both the city of Surprise fees and the city of Eugene's fees are on gross revenue. They are not per-foot charges or per-pole charges. There really is no significant way to distinguish what was at issue there from the fees that are at issue here. It is as for the MCI's argument that somehow under the Biddart test that those fees would not be taxes, I submit that the Court did that examination in the city of Surprise test and came to the opposite conclusion. So — I have one before you sit down. I have one question for you that I asked counsel. The district court knocked out not only the — or applied the Tax Injunction Act here to the fees that should lack jurisdiction. They also lumped into that the challenge to the non-fee-based aspects of the ordinance. Right. And she did it on the grounds of judicial efficiency, judicial economy. Right. Because they were connected. Right. They were intricately connected. And then she cited, I believe it's Colorado River. Right. I don't understand what she did. Well, I think what she did is pretty straightforward. If you read this complaint, it is about the fees. And the challenges to the ancillary application procedures are a very, very small piece of this case and all intricately entwined with the challenge to the fees. And she made a decision that keeping the — that it was impossible to separate out as separate claims the challenges, the fee challenges, the couple of paragraphs that challenge non-fee-related provisions. And in the case before this, we did exactly that. We looked at the in-kind or non-fee provisions and then looked at the fee provisions. Would it be fair to remand those back to the district court for the district court to sort out and resolve? The non-fee? Yes. You could. You could. The key is, is that the Tax Injunction Act deprives the court of jurisdiction over the challenges to the fees because they're taxes. You certainly could remand the few pieces of the case left back if you thought that was appropriate. If the fees are then challenged in state court, which clearly they can be, then obviously — well, not obviously, perhaps a request to abstain to federal court would result. But there's nothing that would prohibit you from doing that, I don't think. The sections that you characterize as non-fee sections, how do they relate to the fee? They are — the NCI claims that the information they have to provide the city about their ability financially to complete projects that they start and such is onerous, those kinds of things. to check out somebody's ability to perform and to be in a position to provide post-revenue information so that one can determine whether 7 percent is a correct figure or not. And to that extent, they are indeed inextricably entwined, are they not? I'm not asking for information to see that you're getting paid what you claim you're entitled to be paid. And I think that what the district court concluded is that those challenges were so minor compared to the challenges to the fees that there wasn't really a case left to keep. If you disagree with that, you certainly can — I see nothing that prohibits you from remanding the non-fee challenges to the district court and upholding the district court on the fee provisions. And NCI may not want to pursue those. They may not. If they're so minute, they may not. They may not, or they may choose to go to state court with the fees, and we may ask the federal court to abstain. It's all possible. Hard to know. Okay. Thank you. Thank you. I'll give you a minute. Thank you, Your Honor. Three points. Or whatever time you have left. You've got at least a minute. All right. You've got at least a minute. Three points. Number one, where there is a voluntary transaction — we don't even reach Bidart, and it doesn't matter how the money is used. That's what the court said in Arizona Life. Where there's a voluntary, contractual, consensual transaction, the city can use the resulting revenue for general public purposes. That doesn't make it a tax, and that's what a right-of-way fee is. Number two, you cannot leave it up to the city to decide whether to opt in to preemption, and by applying Bidart and saying it all depends whether the city is going to use the resulting revenue for general public purposes, that destroys the whole idea of preemption. Why does it destroy it?  Why doesn't it just let those folks who are sitting locally in a position determine the nature of the charge for the use of a local right-of-way? Congress doesn't own the right-of-way. The city owns the right-of-way. But Congress preempted — No, the Congress isn't in a position to decide the ownership interest of the city. It's not a question of divesting the city of ownership. It's a question of restricting the city's authority to use that ownership as a means of blocking competitive entry. That was the fundamental purpose of the 1996 Act. And to say that it's up to the city to decide whether to subject itself to preemption conflicts with that basic purpose. Your last point. My last point is that in Surprise, the Court rejected the argument that because these fees were proprietary, Bidart didn't apply. That's the only argument that was rejected in Surprise. It didn't address the very devastating impact that would happen if the Court were to say it's up to the locality to decide whether its right-of-way fee is preempted. That would destroy the Act. Okay. Thank you. We appreciate your argument.
judges: Paez, Rawlinson, Jenkins